Filed 2/23/26  In re S.A. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re S.A. et al., Persons Coming Under the Juvenile Court Law. | B336413-B, B340419-A, C, B342266-A, B345640-D |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.B. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. Nos. 20CCJP03089-A-D; 24CCJP01536-A) |

APPEAL from orders of the Superior Court of Los Angeles County, Cristina G. Legaspi, Judge, and Lucia J. Murillo, Juvenile Court Referee.  Affirmed; remanded with instructions as to case number B345640.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant S.B.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant James A.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

In these four appeals, mother S.B. (Mother) appeals the juvenile court's orders terminating her parental rights over five of her children: David B. (also known as King or Rose) (born June 2015), S.A. (born June 2019), O.B. (born May 2021), M.B. (born September 2022), and R.B. (born May 2024).[1] M.B.'s father James A. also appeals the court's termination of his parental rights over M.B., and its denial of his petition for reinstatement of reunification services and/or placement of M.B. with a paternal uncle.

Mother contends she established the beneficial parental relationship exception to the termination of her parental rights

---

[1] Mother's appeal in case number B336413 is from the termination of her parental rights for S.A. Appeal case number B340419 is from the termination of her parental rights for David and O.B. Appeal case number B342266 is from the termination of her parental rights for R.B. The children's respective fathers are not parties to these appeals. Appeal case number B345640 is from the termination of parental rights for M.B., from which both Mother and M.B.'s father, James, appeal.

2

with regard to David, S.A., and O.B., and the juvenile court abused its discretion by failing to apply the exception. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[2]  With regard to R.B. and M.B., Mother contends the juvenile court violated her substantive due process rights by failing to enforce its visitation orders, precluding her from being able to fully and effectively raise the beneficial parental relationship exception.  James joins Mother's arguments with regard to M.B., and contends the juvenile court violated his substantive due process rights by failing to ensure regular in-person visitation for him, prejudicially impacting his ability to bond with his daughter.  We conclude that Mother and James have not demonstrated the juvenile court erred or abused its discretion as to the beneficial parental relationship exception; and accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The 2020 Dependency Petition for David and S.A.*

In June 2020, David and S.A. were removed from Mother's physical custody and placed in foster care.  The Los Angeles Department of Children and Family Services (Department) filed a section 300 petition alleging the two children were at risk of serious physical harm due to Mother's substance abuse, their respective fathers' substance abuse, and domestic violence between Mother and S.A.'s father, Brian A.[3]  The juvenile court

---

[2]     Undesignated statutory references are to the Welfare and Institutions Code.

[3]     In 2022, the Legislature amended section 300 (Stats. 2022, ch. 832, § 1), effective January 1, 2023, but the changes do not affect our analysis.

detained David and S.A. from parental custody with monitored visitation for Mother, with discretion to the Department to liberalize visitation to "unmonitored visits, and up to release" for Mother upon five clean drug tests.

At the jurisdiction and disposition hearing in February 2021, the juvenile court dismissed the substance abuse counts as to Mother and David's father, and sustained the petition for Mother's failure to protect and Brian's substance abuse.[4]  The court released David and S.A. to Mother's custody, ordered family maintenance services, and ordered Mother to complete a parenting program, random drug testing, and individual counseling.

B.     *The 2021 Dependency Petitions for David, S.A., and O.B.*

O.B. was born in May 2021 to Mother and father Carnell F.

In August 2021, six months after David and S.A. were released to Mother, Mother tested positive for cocaine, Xanax, and marijuana, and all three children were removed from Mother's physical custody.  Additional reports regarding Mother's substance abuse included giving the children sleeping pills while she did drugs and passing out while caring for the children.  Her neighbors reported they observed the children roaming the apartment building hallways late at night and saw six-year-old David carrying and running with infant O.B.

The Department filed a section 342 subsequent petition on behalf of the two older children and a section 300 petition on behalf of infant O.B., each alleging the children were at risk of

---

[4]     David's father, also named David B., passed away from a drug overdose during the dependency proceedings.

serious physical harm due to Mother's substance abuse. (§ 300, subd. (a)(B)(1).) The juvenile court detained the children from parental custody with monitored visitation for Mother of up to three hours per day, three times per week.

In the one month between the children's detention and the jurisdiction and disposition hearing, Mother called the children daily, had one in-person visit, and missed another visit due to being severely injured with bruises on her face. She claimed she was hurt in a car crash, and presented the social worker with a stock photo of a crashed car.

At the jurisdiction and disposition hearing in September 2021, the juvenile court sustained the petitions, removed the children from Mother with reunification services and monitored visitation with discretion to the Department to liberalize visits, and ordered Mother to complete a full substance abuse rehabilitation program and participate in individual counseling. Without finding any fault, the court noted at the hearing that distance was an obstacle to more frequent visits, "impress[ed] upon the Department the importance of facilitating more frequent visits," and ordered the Department to find ways to increase visits and to provide Mother with transportation assistance.

C.    *Mother's Reunification Services with David, S.A., and O.B. from August 2021 to September 2022*

At the six-month review hearing on March 24, 2022, the juvenile court found Mother's progress on her case plan "has not been substantial." Mother did maintain routine visits with the three children during the first six months of reunification (August 2021 to March 2022). The court found her "partial"

5

progress included "regularly visiting." But she arrived at one visit "out of it," did not interact much, and let O.B. cry in her car seat for about an hour. She missed another visit due to bruises on her face and other injuries from domestic violence.

After seeing Mother's injuries on a video call, David stated, "'I am scared, I am scared that [mother's boyfriends] are hurting my mom . . . . I am scared that when I go home, I am going to have to protect [S.A.] and [O.B.] from my mom's boyfriends. She has too many." After he was removed, David told his therapist and a social worker that he had observed Mother's "boyfriends" line up outside of her bedroom and take turns going in, and he would hear moaning noises from inside the bedroom.

S.A. and O.B. were eligible for Regional Center services, but Mother refused to sign the consent forms, delaying services during the first reunification period. Mother supported David's desire to use the name "Rose" and to wear girl's clothing at home, although she was initially resistant and did not support David wearing girls' clothes at school. David's speech services through an individualized education program were put on hold during the first reunification period because Mother did not provide consent. The juvenile court continued Mother's reunification services and granted the children's caregivers shared educational and developmental rights for the children with Mother.

During the second six-month reunification period (March to September 2022), Mother continued to visit with the children, and completed substance abuse, domestic violence, and parenting programs. Mother was attentive and loving during visits, but struggled to manage the three children. David enjoyed visits with Mother and frequently asked about returning to her. During this period, O.B. was placed with the same caregiver as

David and S.A., and the social worker reported the children were bonded with each other. David was doing well in the home, and called the caregiver "mom" or "foster mom." David was receiving therapy and speech services, and making good progress in school. O.B. was receiving Regional Center services for communication, sensory, and motor delays. Mother disagreed that O.B. needed these services.

Based on her "significant progress" in the case plan, in September 2022 the juvenile court ordered Mother to have unmonitored and overnight visits with the children.

D.      *The 2022 Dependency Petition for M.B. and Termination of Mother's Reunification Services with David, S.A., and O.B.*

Shortly after the September 2022 hearing, Mother gave birth to M.B. M.B. tested positive for benzodiazepines after birth, and Mother tested positive for marijuana and benzodiazepines. David also reported he saw Mother smoking something during an unmonitored weekend visit and she told him not to tell, and that James hit Mother in the stomach while she was pregnant with M.B.

The Department filed a section 300 petition on behalf of M.B., alleging domestic violence between Mother and James, substance abuse by Mother, and substance abuse by James. The juvenile court denied the Department's request to detain M.B. pending adjudication. The Department also filed a section 388 petition to modify the order for unmonitored visits for the other children and restrict Mother's visits to monitored, which the juvenile court denied.

At the jurisdiction and disposition hearing in December 2022, the juvenile court dismissed the substance abuse counts as

7

to Mother and sustained the counts regarding James's domestic violence against Mother and his substance abuse. Both parents attended the hearing. The court detained M.B. from James and released M.B. to Mother. The court ordered both parents to complete a substance abuse rehabilitation program and participate in individual counseling.

During the third and final reunification period for the other three children (September 2022 to April 2023), David continued to receive wraparound services and individualized education program services for speech and language impairment and to assist with behavioral needs and past trauma. David enjoyed visits with Mother. O.B. continued to receive Regional Center services due to delays in expressive communication and gross motor ability, including weekly child development services such as occupational therapy. O.B. responded well to services and was walking independently at 18 months.

Seven-year-old David told the caregiver that, during visits with Mother, he was told to prepare food for himself and his younger siblings, change the diapers, and give the younger siblings baths. The Department was concerned David was being "parentified." David disclosed to a social worker and his caregiver that in October 2022, Mother drove the children to a store, left them unattended while she went inside, and a man entered the car. David kicked the man, who then exited the car. David subsequently retracted this account and said it was not true.

In late January and early February 2023, Mother tested positive for benzodiazepines, cocaine, methamphetamine, and fentanyl. In February, the court ordered M.B. removed from Mother's custody, and the Department placed her in a foster

home.  In February, a reporting party also stated David disclosed that Mother left the children in the care of a 17-year-old uncle while she went to a party, David saw Mother having sex with a man in the home, and David was left to care for and feed his younger siblings.  Mother told David that if he told anyone what happened in the home, she would kill herself.  When interviewed, David denied everything except being left with the uncle, and stated he felt safe with Mother and wanted to return to her.

In March 2023, the juvenile court modified Mother's unmonitored visits to monitored visits.  In March, the Department also filed a section 342 subsequent petition on behalf of M.B. based on Mother's substance abuse.

At the status review hearing in April 2023, Mother testified her positive drug tests could not be accurate because she had used fake urine for her tests on those dates.  She testified she purchased synthetic urine "off and on" for her tests when she could afford it.  The court stated her argument was "implausible," and her testimony that she periodically used synthetic urine "calls into question everything that Mother said to the worker, to the court.  It is unbelievable to me that Mother would testify she's been lying to the Department this whole time with her drug tests."  The court found Mother's progress to be "minimal," terminated reunification services for David, S.A., and O.B., and set a permanency planning hearing.

The court also held the jurisdiction and disposition hearing on the section 342 petition for M.B., sustained the petition, and removed M.B. from parental custody.  Both parents were present at the hearing.  James had not yet been able to visit M.B.  The court ordered reunification services for both parents, including substance abuse programs, parenting programs, random drug

testing, and individual counseling. The parents were permitted a minimum of three monitored visits per week for three hours per session, and the court ordered the Department to provide a visitation schedule and transportation assistance for Mother so that she could visit.

E.  *Permanency Planning Proceedings for David, S.A., and O.B. and Termination of Reunification Services for M.B.*

Between April and October 2023, Mother did not have in-person visits. The Department offered in-person visits to Mother on April 27 and May 11, but she was unavailable. She had virtual visits with the children, but her visits were not consistent.

On June 23, 2023, Mother filed a section 388 petition asking that M.B. be placed with the paternal grandmother or paternal aunt, which the court summarily denied.

S.A. was placed with his paternal grandparents in June 2023. The Department reported S.A. had a strong, positive bond with his grandparents and they ensured he received services he needed for his speech and other issues. S.A. had possible signs of autism, and received services for speech delay, individual therapy, and assistance for social and recreational support and potty training.

David and O.B. were placed together with foster mothers Olivia M. and Sheena C.

Between early June and late August 2023, Mother was not in contact with the Department. When she resumed contact, it was not consistent. At an October 2023 hearing, counsel for Mother requested in-person visits resume, and the juvenile court responded the report showed the Department "attempted to arrange visits for her. She didn't respond." As of August 2023,

James was consistently participating in virtual visits with one in-person visit in July that had gone well, and weekend visits arranged. In October 2023, the Department reported James had failed to keep consistent contact with the Department, and since the July visit, he had not been available when the Department tried to contact him to arrange more in-person visits.

In October 2023, the court identified a prospective plan of adoption as the most appropriate plan for David, S.A., and O.B.

Mother filed section 388 petitions for David, S.A., and O.B. in October and November 2023, requesting the court return them to her custody or in the alternative reinstate reunification services and order overnight visitation. She attested she completed a 30-day inpatient substance abuse treatment program in July 2023 and another parenting program, continued to participate in 12-step meetings and individual therapy, and that the children were bonded to her and wanted to return to her. The court summarily denied Mother's section 388 petitions. The court noted Mother had not had consistent visits for several months.

The Department reported in December 2023 that David and O.B. had a strong, positive bond with their caregivers. David received speech services, individual therapy, and treatment for attention deficit hyperactive disorder and posttraumatic stress disorder. O.B. had age-appropriate social and emotional adjustment but continued to receive services for developmental delay.

The Department also provided a report and assessment in December 2023 that Mother and the children did not have a beneficial relationship. Mother's interactions with the children were largely appropriate, but she focused primarily on the older children. Mother had difficulty soothing the younger children

11

and difficulty managing and supervising all the children. Mother was not a source of comfort for the children and at times left them unattended during her visits, and she did not consistently bring food or activities to engage all the children at their appropriate developmental levels. The Department also noted that during unmonitored visits, David prepared food for himself and his siblings, as well as changed diapers and bathed the younger siblings. The Department concluded Mother had a friendly, familiar relationship with the children, despite inconsistent visits, but was not a stable, supportive, or consistent figure in the children's lives.

In December 2023, the Department held a combined section 366.26 hearing for David, S.A., and O.B. and review hearing for M.B. Mother testified she had ongoing visitation problems with S.A.'s grandparents and had not spoken with S.A. virtually or in person since August. County counsel confirmed the grandparents were resisting the visitation schedule and that the grandparents disagreed with Mother's entitlement to visitation with S.A. A Department social worker testified that in-person visits were not set in September because Mother stated she could only do virtual visits and that the Department had spoken with Mother in November and provided a schedule for in-person visits in early December. Mother was able to have some virtual visits with M.B., but not in-person visits.

With regard to M.B., the court found Mother's progress on her case plan to be substantial and granted another six months of services. The court ordered the Department to consult with Mother and the caregiver and to provide Mother with a visitation schedule. The Court found James's progress to be nonexistent but continued his services for another six months.

In March 2024, the caregiver for David and O.B. reported Mother's virtual visitation was inconsistent, and she had not reached out to schedule in-person visitation. During virtual visits, she focused only on David, not O.B., and had to be admonished not to discuss the court case with the children.

Following the second period of reunification services for M.B., in March 2024, the court found Mother's progress to be partial and James's progress to be minimal, terminated reunification services for M.B., and set a permanency planning hearing. The Department reported James's last contact with the Department was in October 2023, so no in-person visits had been arranged, but the caretaker reported he maintained consistent, engaged virtual visits with M.B. three times a week. James asserted at the hearing that he completed the majority of his case plan and that the social worker failed to get back to him about in-person visits, and the court stated in response that its ruling was limited to the evidence before it.

Mother overdosed in March 2024 and was revived by first responders after being found unconscious on the ground near her car. She was in her third trimester of pregnancy at the time. Mother refused transportation to a hospital and signed a form saying she left against medical advice.

The Department reported in April 2024 that Mother had provided no prospective monitors for visits and struggled with scheduling in-person visits. At one in-person visit, she engaged more with the caregiver instead of the children, and she had to be admonished to engage with the children and to stop whispering in David's ear.

F.    *The Section 366.26 Hearing Terminating Parental Rights as to S.A.*

The juvenile court held the continued section 366.26 hearing for S.A. on March 29, 2024. S.A.'s counsel asked the court to terminate Mother's parental rights, and Mother opposed. Mother asked the court to apply the beneficial parental relationship exception and order legal guardianship as the permanent plan.

Mother testified that when she previously had custody of S.A., they did everything together and spent no time apart. And presently, when she would talk to S.A., he would tell Mother he loved her and missed her, and he would ask when he could go home with her. Mother testified she was only allowed four in-person visits with S.A. after her visitation became monitored, and blamed the social worker and caregiver for the lack of recent visits. Mother's counsel argued Mother had a strong bond with S.A., her visits were consistent for the limited visits that were provided to her, and it would be detrimental to S.A. to terminate Mother's parental rights.

S.A.'s counsel argued Mother had not demonstrated consistent recent visitation with S.A., who had spent a substantial amount of his life out of Mother's care. Counsel also argued the bond between Mother and S.A. was not beneficial, and evidence that S.A. enjoyed playing with Mother was insufficient to find detriment.

The court found Mother did not meet the first prong of the beneficial parental relationship exception under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), because she did not have consistent, regular visits with S.A. The court determined Mother "hasn't been forthcoming with this court[,] she has blamed the

14

lack of visits on the caregivers and the Department." The court also stated: "I can't find there is a bond to the extent that [S.A.] would be detrimentally affected if that bond were severed." The court also noted S.A. lived with Mother for 17 months of his life, and he was approximately five years old at the time of the hearing. The court concluded the beneficial parental relationship exception did not apply, and terminated Mother's parental rights as to S.A.

Mother timely appealed.

G.    *The 2024 Dependency Petition and Bypass of Services for R.B.*

In May 2024, two months after her March overdose, Mother gave birth to R.B. Mother did not consent to drug testing at the hospital, denied any prior dependency history or alcohol and drug use other than marijuana since becoming a parent, stated her prior drug tests were "tainted," and claimed she was not the person who overdosed in March. R.B. exhibited drug withdrawal symptoms at the hospital and received treatment to lessen the withdrawal effects.

R.B. was temporarily detained from Mother's custody and the Department filed a section 300 petition stating Mother's substance abuse placed R.B. at risk of serious physical harm. Before the initial hearing, Mother asked to visit R.B. but failed to show up at the hospital. At the initial hearing, the juvenile court detained R.B. and ordered monitored visits for Mother. The court stated: "Mom, visit your baby as much as you can as many hours allowed." R.B. was placed in the same foster home as M.B.

At the jurisdiction hearing on July 11, 2024, the court sustained the petition, taking judicial notice of the case

15

proceedings for the siblings and noting prior services had not successfully rehabilitated Mother's substance abuse. As of June 2024, Mother had not arranged to visit R.B. Mother had reported to the Department that she needed a monitor for her visits and the last time she saw R.B. was at the hospital.

The court continued the disposition hearing to July 24, 2024, at which it removed R.B. from Mother and bypassed Mother for services due to the termination of her reunification services and termination of parental rights for her other children. Mother's counsel stated that Mother asserted she had been limited to one phone visit per week, and the Department's counsel responded that Mother had longstanding and recurring issues with visitation, including changing phone numbers and periods of time during which her whereabouts were unknown. The court ordered the Department to facilitate Mother's visits and to provide a monitor, but advised Mother: "[Y]ou need to call the social worker or whoever the go-between is for you to make your scheduled visits 24 hours in advance to confirm your visits. This child is being made available for you to visit . . . . It's not fair to the child to get the child ready for a visit if you're not going to make it."

In early August 2024, R.B. was placed with Olivia and Sheena, the caregivers of David and O.B. The social worker observed R.B. and the caregivers had a strong, positive, and supportive bond, and the caregivers were eager and willing to adopt R.B., along with her other siblings already in their care. The placement was in line with a plan for both R.B. and M.B. to transition to the home with a plan of adoption.

Before R.B.'s placement with her siblings, Mother did not ask for any visits with R.B. or ask about R.B.'s wellbeing. Mother

had initially visited the siblings on a weekly basis and later, on a monthly basis.  After R.B. was placed with the siblings, Mother called and spoke to David but, as of late August 2024, had only inquired about R.B.'s wellbeing on one occasion.  The Department reported Mother "has had minimal to no contact with child.  Mother prioritizes her sporadic contact to focus on the older siblings, and child, [R.B.], seems to be an afterthought."

H.    *The Section 366.26 Hearing Terminating Parental Rights as to David and O.B.*

The juvenile court held the continued section 366.26 hearing for David and O.B. on August 29, 2024.  Mother was not present but was represented by counsel.

The Department reported that David and O.B. were bonded well to Olivia and Sheena, whom the children called "mom" and "nana."  David stated, "'I feel good about adoption, where they take care of you forever,'" but he also wanted "'to go back to my mom's house [because] she bought me lots of stuff.'"  Mother had not visited in person since May 2024, and she only had two telephone visits with the children between June and August.  During the August phone visit, she only asked to speak to David.

Mother's counsel argued the beneficial parental relationship exception applied.  Counsel argued Mother attempted to regularly visit, but was stymied due to distance, her work schedule, and not having a monitor.  Counsel asserted the children had a positive relationship with Mother and were happy and comfortable in her care, and David called Mother "mom" and expressed wanting to return to her.  The children's counsel argued the exception was inapplicable due to Mother's inconsistent visits, lack of engagement during monitored visits,

17

and the reported safety issue that arose during Mother's unmonitored visits, and that the stability of adoption outweighed any detriment to the children from terminating parental rights.

The juvenile court found the children were adoptable and Mother failed to prove the exception to termination of her parental rights applied. The court stated at the hearing that "[w]hile [Mother's] visitation may arguably be found by the court as regular, what the court can find is that the children derive some benefit from it. Some benefit. An incidental familial benefit. And that doesn't even go towards proving prong two [of the *Caden C.* factors]." "As such, we cannot go to prong three, but even arguendo, if we do, the court does not find that termination of parental rights would be detrimental to the children." The children were "in a home that's loving, ready and willing to provide permanence, and stopping that in order to . . . [go] to a lesser permanent plan, does not serve their best interest. In fact, that would be detrimental to them versus the permanency in adoption." Under the circumstances, the court determined the beneficial parental relationship exception did not apply and terminated Mother's parental rights as to David and O.B.

Mother timely appealed.

I.      *The Section 366.26 Hearing Terminating Parental Rights as to R.B.*

The juvenile court held the section 366.26 hearing for R.B. on November 20, 2024.

The Department reported five-month-old R.B. was bonded with her caregivers, who were affectionate with her and committed to providing R.B. with stability and raising her with her siblings. Mother's phone was broken in July, and when the

18

social worker reached her at her new number in late July, she only asked about having visits with David, not R.B. Mother requested weekly telephone visits with the children, stating she had transportation and scheduling issues that made it difficult to visit during the week. In early August, Mother's phone was again broken, and by September 25, she still did not have a replacement. On September 29, Mother provided a new phone number and contact information for a potential monitor. The social worker contacted the potential monitor but heard nothing from Mother or the potential monitor before the November report. The caregivers reported Mother had no phone calls with R.B., and only wanted to speak to David and did not ask about R.B. when she did call.

Mother testified she tried to schedule visits by calling, texting, and emailing the social worker, but "[t]he social worker failed to respond to me about anything that I ask her about[,]" and "did not make any attempts to reach out [to Mother's proposed monitor]" to facilitate an in-person visit. Mother stated she always provided her new phone numbers, and called the caregiver every Friday at 6:00 p.m. as scheduled, but her calls were not answered.

The Department's counsel argued Mother had not visited, was unable to be reached for long periods of time and cited her own scheduling conflicts for not visiting, only asked about David, and "blames everyone instead of taking responsibility for what led to the lack of visitation." Counsel also asked the court to find Mother's testimony lacked credibility, arguing the social worker reached out regarding visitation, but neither Mother nor the proposed monitor responded.

19

Mother's counsel argued Mother had "a substantive due process interest in visitation with her children," it was "unfair to try to assess or to terminate parental rights based on lack of relationship when she was never even given that opportunity to do so," and "the court was obligated to permit her to visit the children pending the [section 366.26] hearing, unless it found that visitation would be detrimental to the child." Counsel argued the Department failed to facilitate Mother's visits, and the proposed monitor's lack of response "doesn't alleviate the Department from their responsibilities to at least offer a monitor."

The court observed R.B. was Mother's fifth child to be removed from her care, and Mother overdosed while pregnant but did not acknowledge the severity of what happened. The social worker had no contact with Mother for extended periods due to her telephone issues, and Mother's testimony that she was able to call weekly "flies in the face of information that [M]other provided that she had no working phone." The court noted Mother "testified to refute" evidence that she previously claimed scheduling issues prevented her from visiting, "and now it goes to weight. Who do I believe more?" The court also addressed "Mother's contention that no one assisted her with getting a replacement phone, getting help with even a landline visit, getting transportation help," explaining: "This is not a reasonable services [case]. . . . If Mother really had legitimate proof of misdoing, wrongdoing, or malfeasance by [the Department], there was no walk-on. There was no [section 388 petition] filed to let the court know that her visitations were being withheld, that the visitation orders were being violated by the agency."

20

The juvenile court further noted: "Even if I were to find that Mother had regular visitation and contact up until her phone stopped working, Mother would have had to show that . . . the child, not the Mother, the child derived a benefit from this contact, and that benefit equates to a positive and emotional attachment. This child was a newborn when the child was removed, and . . . there was no such bond." Considering the detriment to R.B. from the termination of parental rights versus the benefit of adoption, the court found there would be no detriment. The court concluded no exception applied and terminated Mother's parental rights as to R.B.

Mother timely appealed.

J.     *The Section 366.26 Hearing Terminating Parental Rights as to M.B.*

The permanency planning hearing for M.B. was continued for several months to transition her into the same home as her siblings (which occurred in October 2024), and because James was incarcerated for violating a domestic violence restraining order to stay away from Mother.

On January 22, 2025, Mother told the court she last had an in-person visit with M.B. in May 2024, and the court issued an order for the Department to show cause regarding Mother's contention that she was being denied visits and calls with M.B.

In February 2025, James filed a section 388 petition alleging he was sober and had completed various services, and requesting the court reinstate reunification services and consider a relative placement with his brother. James did not allege that the Department had failed to comply with visitation orders or that his visitation with M.B. was withheld.

21

The court held the order to show cause hearing on Mother's visitation on March 3, 2025, and discharged the order against the Department. The court found the Department's reports and records "very thorough" and "in direct contrast" to Mother's allegation of no visits since May 2024. The court found "it appears that Mother has been having visits with [M.B.]," including "some in-person visits" as well as virtual. The court ordered the Department to facilitate Mother's in-person visits at a location halfway between Mother and the children, and it urged Mother to get "as much contact as you can" under her "three by three" visitation schedule, including virtual and in-person visits.

On March 26, 2025, the juvenile court found reasonable services had been provided.

The court held the final section 366.26 hearing and section 388 hearing for M.B. on April 14, 2025.

James testified he had completed domestic violence and parenting programs and drug treatment; and starting in 2025, he began visiting M.B. once a week for about two hours. He was establishing a bond with her, and wanted to reunify or have his brother adopt her. James did not argue he had been denied visitation. The Department reported James did his best to engage with M.B. during several in person visits, and M.B. was gradually readjusting to being with him and exhibited no negative behaviors after visits. The court concluded James had established "changing, not changed" circumstances and denied his section 388 petition, stating it could not find it was in M.B.'s best interests to reinstitute reunification so late in the proceedings, when permanency had been pending for a long time.

Neither parent testified further. Mother's counsel conceded that Mother could not establish the *Caden C.* factors but

22

reiterated that Mother believed the Department and caregivers were blocking her attempts to visit and call. James's counsel argued the beneficial parental relationship exception should apply because he had been having recent consistent visits with M.B.

The juvenile court found M.B. was adoptable and neither parent had established the beneficial parental relationship exception should apply, and it terminated parental rights as to M.B. The court stated, "I understand the history of the case, and Mother's contention that the Department and the caregiver has precluded Mother's visitation. And the court dealt with the Department and ordered [child and family team meetings] and funds and facilitations and halfway marks. ¶ But today, the court cannot find that regular visitation and contact. During the three years that this case has been pending before the court, Mother's visitation has been less than regular and more recently than not, they have been more irregular."

Mother and James each timely appealed.[5]

## DISCUSSION

A.   *Governing Law and Standard of Review*

The purpose of a section 366.26 selection and implementation hearing is "'to provide stable, permanent homes' for dependent children. (§ 366.26, subd. (b).) If the court has

---

[5]   Specifically, Mother only appealed from the April 14, 2025 section 366.26 hearing. James appealed from the section 366.26 hearing; the January 22, 2025 and March 3, 2025 hearings relating to the OSC; and the October 21 and July 18, 2024 orders continuing the section 366.26 hearings.

decided to end parent-child reunification services, the legislative preference is for adoption." (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 780; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["if the child is adoptable[,] . . . adoption is the norm"]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 (*Marilyn H.*) [state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" and reunification efforts have been unsuccessful].)

"When the court finds . . . the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of six enumerated exceptions applies." (*In re Elizabeth M., supra,* 19 Cal.App.5th at pp. 780-781; see § 366.26, subd. (c)(1)(B); see also *In re Celine R., supra,* 31 Cal.4th at p. 53.)

The beneficial parental relationship exception allows the court to order a permanent plan other than adoption if a parent demonstrates, by a preponderance of the evidence, "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra,* 11 Cal.5th at p. 631; see § 366.26, subd. (c)(1)(B)(i).) It applies only in "'exceptional circumstances.'" (*Caden C.,* at p. 631; accord, *In re Celine R., supra,* 31 Cal.4th at p. 53.)

A parent has regular visitation and contact when the parent "'visit[s] consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.E.* (2023) 91 Cal.App.5th 683, 691.) Whether "'the child would benefit from continuing the relationship'" with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the

parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 316-317 (*Katherine J.*).)  When determining whether termination of parental rights would be detrimental to the child, courts need to consider "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Caden C.*, at p. 633; accord, *In re D.P.* (2022) 76 Cal.App.5th 153, 164.)

We apply a "hybrid standard of review" to the beneficial parental relationship exception.  (*In re Katherine J., supra,* 75 Cal.App.5th at p. 317; see *In re I.E., supra,* 91 Cal.App.5th at p. 691.)  The first two elements are reviewed for substantial evidence.  (See *Caden C., supra,* 11 Cal.5th at pp. 639-640.)  "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  As a reviewing court, we do "'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'  [Citation.]  The determinations should 'be upheld if . . .  supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'"  (*Caden C.,* at p. 640.)

As for the third element, we review factual determinations for substantial evidence and review the "the ultimate decision— whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent . . . for

25

abuse of discretion." (*Caden C., supra,* 11 Cal.5th at p. 640; see *In re I.E., supra,* 91 Cal.App.5th at p. 691.) "A court abuses its discretion when it '"has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination"'" or when it "rest[s] a disposition on an error of law." (*In re M.G.* (2022) 80 Cal.App.5th 836, 848-849; see *Caden C.,* at p. 641; *In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

If there are no disputed facts, whether the juvenile court's application of sections 366.26 or 388 violated a parent's substantive due process rights "is a purely legal question, . . . which we review de novo." (*In re S.G.* (2024) 100 Cal.App.5th 1298, 1310.) However, on appeal we do not reweigh the evidence, credibility of witnesses or the juvenile court's credibility determinations. (See *In re I.B.* (2020) 53 Cal.App.5th 133, 158.)

B.  *The Juvenile Court Did Not Abuse Its Discretion by Concluding Mother Failed To Establish the Beneficial Parental Relationship Exception*

Mother argues the trial court erred by not applying the beneficial parental relationship exception to the termination of her parental rights for David, S.A., and O.B.[6] As noted, it was Mother's burden to establish all three elements required for the

---

[6] Mother does not argue on appeal that the beneficial parental relationship exception should apply to the termination of her parental rights for M.B. and R.B. And James does not argue on appeal that the beneficial parental relationship exception should apply to the termination of his parental rights for M.B.

beneficial parental relationship exception to apply. (See § 366.26, subd. (c)(1)(B)(i); see also *Caden C., supra,* 11 Cal.5th at p. 636.) Mother's arguments essentially invite us to reweigh the evidence before the juvenile court, which we are unable to do on appeal.

1.    Regular Visitation and Contact

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra,* 11 Cal.5th at p. 632.)  The juvenile court found at the section 366.26 hearings for David, O.B., and S.A. that Mother failed to maintain regular visitation and contact with the three children during the dependency proceedings, despite being permitted three visits per week.

Substantial evidence supports the court's finding the first *Caden C.* factor was not satisfied.  That evidence includes: Although Mother initially maintained regular monitored visits with David, O.B., and S.A., and was granted unmonitored and overnight visits in September 2022, the consistency of her visits was reduced significantly after the court modified her visits to monitored visitation in March 2023.  Between April and October 2023, Mother did not have in-person visits, fell out of contact with the Department for long periods of time, and did not respond or stated she was unavailable for in-person visits.  She had virtual visits with the children, but they were not consistent.  Her virtual and in-person visits remained inconsistent from October 2023 through termination of parental rights for S.A. in March 2024 and termination of parental rights for David and O.B. in August 2024.  The court also determined Mother "hasn't been forthcoming with this court[,] she has blamed the lack of visits on

the caregivers and the Department."

### 2.     Beneficial Relationship

The second prong of the beneficial parental relationship
exception has two components: the child has a positive emotional
attachment to the parent, and the child would benefit from
continuing the relationship.  (See *Caden C., supra,* 11 Cal.5th at
p. 636.)  Factors the court may consider include "'[t]he age of the
child, the portion of the child's life spent in the parent's custody,
the "positive" or "negative" effect of interaction between parent
and child, and the child's particular needs.'"  (*Id.* at p. 632; see
*In re Katherine J., supra,* 75 Cal.App.5th at p. 317.)

The court stated with regard to David and O.B. that,
"[w]hile [Mother's] visitation may arguably be found by the court
as regular, what the court can find is that the children derive
some benefit from it.  Some benefit.  An incidental familial
benefit.  And that doesn't even go towards proving prong two."
"As such, we cannot go to prong three."  As to [S.A.], the court
stated:  "I can't find there is a bond to the extent that S.A. would
be detrimentally affected if that bond were severed."  The court
noted S.A. lived with Mother for 17 months of his life, and he was
approximately five years old at the time of the hearing.

Substantial evidence supports the juvenile court findings
that Mother's visits provided at most only an "incidental benefit"
to David and O.B, and that there was not a bond that would be
detrimentally affected as to S.A.  Mother's monitored virtual and
in-person visits, as noted, were inconsistent.  And even assuming
a positive emotional attachment, the record contains substantial
evidence that the benefits to the children of continuing a parental
relationship with Mother did not extend beyond a friendly bond.

As the juvenile court noted, the children spent much of their lives out of Mother's custody. David and S.A. were removed from Mother's custody between June 2020 and February 2021, and again from August 2021 on; and O.B. was removed at three months old in August 2021. Mother primarily focused on David or the older children generally (i.e., David and S.A.), rather than O.B.

After being ordered to have monitored visits in March 2023, Mother did not progress again to unmonitored visits to deepen her bond with any of the children. The juvenile court did not abuse its discretion by finding that, however pleasant their intermittent visits may have been, the record also reflected negative effects stemming from their visits with Mother. Mother was sometimes "out of it," struggled with managing and soothing the children, and inappropriately spoke about the court case during visits. Sometimes she failed to show up for planned visits. During Mother's unmonitored visits prior to March 2023, the children were insufficiently supervised, and David took on parentified caretaking responsibilities for his younger siblings, including preparing meals and changing diapers. David also witnessed or heard sexual activity and domestic violence between Mother and men in the home.

David, S.A., and O.B. also had special behavioral and developmental needs, including speech and language challenges, developmental delays, and O.B. had drug exposure and withdrawal symptoms. David, who had previously witnessed domestic violence toward Mother and sexual activity between Mother and multiple men in the home, also continued to worry about Mother's safety. Mother was not engaged with the children's developmental and behavioral health services or

David's individualized education program and remained in a relationship with James where he inflicted domestic violence upon her. Substantial evidence supports the court's finding Mother did not satisfy the second *Caden C.* factor.

### 3. Detriment from Termination

The third and final prong of the beneficial parental relationship exception is whether the stability and permanence of the children's adoptions were outweighed by the harm caused to them by terminating their parental relationship with Mother. (See *Caden C., supra,* 11 Cal.5th at pp. 633-634.) As stated, the statutory preference in a permanency hearing for a dependent child is adoption. (See *id.* at p. 631 ["'the norm . . . remains adoption'"]; accord, *In re Celine R., supra,* 31 Cal.4th at p. 53.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the juvenile court orders adoption. (See *Caden C.,* at p. 634.)

The juvenile court concluded that the benefits of consistency and stability in the adoptive homes of the children's foster caregivers outweighed any harm caused by the termination of Mother's parental relationship. The court stated with regard to David and O.B. that, "arguendo, if we do [go to prong three], the court does not find that termination of parental rights would be detrimental to the children," and as to S.A., it found there was no bond "to the extent that [S.A.] would be detrimentally affected if that bond were severed." Substantial evidence supports the juvenile court's conclusion that each child's needs were well met in his or her adoptive placement. This evidence included: the children were strongly bonded with their caretakers; David and

30

O.B were in a stable placement with most of their siblings; and the children's special needs were being met by their caretakers through individualized education, speech services, Regional Center services, occupational therapy, and individual therapy.

*Caden C.* instructs juvenile courts to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Caden C., supra,* 11 Cal.5th at p. 633.) On the other hand, "a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*) Here, the record supports the juvenile court's determination that the benefit and security provided by the children's placement with their adoptive parents outweighed any harm that would be caused by the loss of their relationships with Mother.

This is true even with regard to David, the oldest child who had the longest custodial relationship with Mother. David enjoyed visits with her, stated he felt safe with her and wanted to return to her, and called her "mom," but also was bonded with his caregivers and stated: "'I feel good about adoption, where they take care of you forever.'" In many cases, "a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C., supra,* 11 Cal.5th at p. 634; see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1158-1159 [affirming finding beneficial

parental relationship exception did not apply where father regularly visited daughter and developed beneficial bond with her, but she viewed father as "'a fun, friendly person' to have visits with," not a parental figure].) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason; in so doing, we cannot substitute our view for that of the juvenile court. (See *Caden C.,* at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

In light of the evidence before the juvenile court, its determination that Mother did not satisfy the three *Caden C.* factors—because her visits were not consistent, her bond with David, S.A., and O.B provided only an incidental benefit to them, and the benefits to the children of adoption outweighed the harm to them of terminating their parental relationship with Mother—was not arbitrary, capricious, or otherwise an abuse of discretion.

C.      *The Juvenile Court did not Violate Mother's or James's Substantive Due Process Rights*

Mother contends the juvenile court violated her substantive due process rights by purportedly failing to enforce its visitation orders, precluding her from being able to raise the beneficial parental relationship exception to the termination of her parental rights as to M.B. and R.B.[7] James joins Mother's arguments as to

_____

[7]      On appeal, Mother does not raise substantive due process arguments relating to her visitation with David, S.A., or O.B. Separately, Mother observes, and the Department does not dispute, that the minute order from the section 366.26 hearing mistakenly states the juvenile court found the parents maintained regular and consistent visitation, and the JV-320

32

M.B., contending the juvenile court also violated his substantive due process rights by failing to ensure regular in-person visitation for him.  We conclude James forfeited his due process arguments as to M.B. by failing to raise them in the juvenile court, and that Mother's argument lacks merit.  As to R.B., we conclude the record does not support Mother's contention the court failed to enforce its visitation orders and also conclude Mother has not demonstrated a substantive due process violation.

"Parents whose children are subjects of a dependency proceeding have constitutionally protected interests in a continued relationship with their children."  (*In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1341 ["Children also have a fundamental interest in stability and permanency deserving of constitutional protection."]; see *Marilyn H., supra,* 5 Cal.4th at p. 306 ["A parent's interest in the companionship, care, custody and management of his children is a compelling one, ranked among the most basic of civil rights."]; *In re Jasmon O.* (1994) 8 Cal.4th 398, 419.)  "[C]hildren have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.]  The interests of the parent and the child, therefore,

---

form contains an incorrect date for the termination of parental rights.  These errors do not affect our analysis; however, pursuant to our inherent authority to correct clerical errors in the record, we remand with directions for the juvenile court to correct the identified errors.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

must be balanced." (*Marilyn H.*, at p. 306; *In re S.G., supra,* 100 Cal.App.5th at p. 1313.)

"Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.] The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one." (*Marilyn H., supra*, 5 Cal.4th at p. 307; accord, *In re S.G., supra,* 100 Cal.App.5th at pp. 1313-1314.)

"The state's interest requires the [juvenile] court to concentrate its efforts, once reunification services have been terminated, on the child's placement and well-being, rather than on a parent's challenge to a custody order." (*Marilyn H., supra*, 5 Cal.4th at p. 307, accord, *In re S.G., supra,* 100 Cal.App.5th at pp. 1313-1314.) Thus, "the sole purpose of the section 366.26 hearing is to select and implement one of the listed permanent plans" in the statute, with "the focus of the case shifted away from reunification to providing a permanent, stable placement for the children." (*Marilyn H.,* at p. 304.)

1. As to M.B., James forfeited his due process argument by raising it for the first time on appeal, and Mother's due process argument lacks merit

Here, James did not raise any substantive due process challenge in the juvenile court. Although James filed a

34

section 388 petition that was heard at the section 366.26 hearing terminating parental rights, the petition did not argue the Department failed to comply with visitation orders or that James's visitation with M.B. was withheld.  Nor did he argue at the section 366.26 hearing that visitation issues precluded him from satisfying the beneficial parental relationship exception. We therefore conclude James forfeited this argument.  (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1127 ["[F]orfeiture generally applies when a party did not alert the juvenile court that he or she objected to an order being made or when a party failed to ask in the juvenile court for relief being sought on appeal."].)

Based on the record before us, we conclude Mother's substantive due process argument as to M.B. lacks merit.  At the section 366.26 hearing, Mother's counsel argued that "the Department and/or the caretaker had essentially blocked all contact with the child for over a year" and that it was only after the court had set the order to show cause that the Department made M.B. available for calls and visits.  But Mother never filed a section 388 petition challenging the Department's compliance with the visitation schedule, or alleging visitation with M.B. had been withheld in violation of due process.

The juvenile court did hold an order to show cause hearing on Mother's allegations that she was being denied visitation with M.B., so her visitation arguments arguably are not forfeited on appeal.  But even considering the merits of Mother's arguments, we conclude there was no due process violation.  Although Mother urges us to accept her version of the facts, we defer to the juvenile court's factual findings and "[w]e do not second-guess the court's credibility calls," as the trier of fact.  (*In re Merrick V.*

35

(2004) 122 Cal.App.4th 235, 254.) Here, the juvenile court made credibility determinations throughout M.B.'s case, to Mother's detriment. It found she had "credibility issues," "very low" credibility, and that "the information Mother provides [] doesn't appear to shake out." The court also held an order to show cause hearing on Mother's allegations that she was being denied visitation with M.B., and found the Department's "very thorough" records directly refuted Mother's claim that she had not visited with M.B. from May 2024 to January 2025. The court discharged the order to show cause because it concluded the Department had fulfilled its duty of ensuring Mother had visitation with M.B. Under the circumstances, Mother cannot establish a substantive due process violation.

2. As to R.B., Mother's due process argument lacks merit

Mother did raise a substantive due process argument at R.B.'s section 366.26 hearing (for the first time and in her closing argument), which the juvenile court appeared to believe was a "reasonable services argument." Mother argues the court erred and that its error was not harmless. Based on the record before us, we conclude there was no due process violation.

Although Mother argues the court did not enforce its visitation orders, she identifies no specific instances where the court failed to do so. Instead, she focuses on the Department, which in her view "failed to facilitate contact and visitation between [M]other and [R.B.]" by not procuring a monitor for in-person visits. Mother relies extensively on her own testimony that "the social workers failed to sufficiently ensure telephone contact" and "never even tried to set up any video conference

36

calls" with R.B. Mother further contends: she consistently called the foster parent "every Friday"; texted and emailed the Department social worker and foster parent for R.B., but received "absolutely nothing" in response; "th[e] social worker did not make any attempts to reach out" to a potential monitor Mother identified; and, Mother kept the social worker and foster parent informed regarding how to reach her and "were the first to be told" when her phone numbers changed.

But the juvenile court found Mother's testimony was not credible given the other evidence before it. The Department's report indicated there were long periods of time when the Department had no way to communicate with Mother because she did not have a functioning cell phone number. The report also reflected that when Mother did communicate with the Department, Mother stated she was unable to visit R.B. in person because of her work schedule and transportation issues, and Mother instead requested phone visitation. Additionally, the Department's report indicated the Department was in contact with Mother in July, August, and September 2024, and the Department reached out to Mother's proposed monitor but never received a response from the monitor. The Department's report stated that when Mother called, the foster parent reported Mother did not ask about or ask to speak with R.B.

At the section 366.26 hearing, the Department's counsel asked the juvenile court to make a credibility determination and not to believe Mother's version of events. In finding that Mother had not maintained regular visitation and contact with R.B., the court explained to Mother that it was deciding "who I believed more," as between Mother's testimony and the Department's reports in evidence. The court found Mother's testimony that she

37

was consistently in contact with the Department seeking to schedule visits "flies in the face" of her own statements to the Department in the reports. Based on these facts, we cannot conclude Mother demonstrated the Department, or court, deprived Mother of her due process right to visitation with R.B.

Mother relies on *In re David D.* (1994) 28 Cal.App.4th 941, 954-956 and *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1407-1408. In both cases, the court of appeal reversed orders terminating parental rights because the juvenile court failed to ensure sufficient visitation pending the 366.26 hearing and remanded with instructions to provide the mother six additional months of services and visitation. But neither was a due process case, and both are distinguishable. *David D.* was "an extraordinary and troubling case" where "[d]ue to the court's order prohibiting visitation between this mother and her children, adequate reunification services were not provided." (*David D.*, at pp. 951, 953.) And *Brittany S.* involved an incarcerated mother where the reunification plan "fail[ed] to provide for visitation" and "limited contact to telephone calls and letters." (*Brittany S.*, at p. 1407.) This case does not involve similar orders prohibiting or limiting Mother's visitation with R.B.

## DISPOSITION

Appeal case number B345640 is remanded for the limited purpose of directing the juvenile court to correct the clerical errors identified by the parties.  The juvenile court's orders terminating Mother's and James's parental rights are otherwise affirmed.

MARTINEZ, P. J.

We concur:

SEGAL, J.                              FEUER, J.

39